Amy Ruth JEFFRIES,
Plaintiff-Appellee,

v.

WAL–MART STORES, INC.,
Defendant–Appellant.

No. 99–4150.

United States Court of Appeals,
Sixth Circuit.

July 20, 2001.

**I**

Amy Jeffries began working at Wal–Mart's Fairlawn, Ohio, store as a courtesy desk clerk and Customer Service Manager on November 5, 1992, and was promoted to "lead" Customer Service Manager on June 8, 1993. In that role, she was responsible for the "front end" of the store and served as immediate supervisor of the lay-away department, the cashiers, the greeters, the courtesy desk, and the other Customer Service Managers. She supervised as many as 100 people, depending on the season, including interviewing, hiring, teaching orientation classes, evaluating, "coaching" (delivering reprimands), giving raises, handling certain scheduling matters, and terminating employees. After she expressed interest in being promoted to store-wide Personnel Manager, the store's then-serving Personnel Manager, Patty Terry, permitted Jeffries to work alongside her and gave her access to more management "personnel options" than she would otherwise have had, including access to files concerning worker's compensation, customer injuries, and annual reviews.

Terry took temporary leave from Wal–Mart in October 1996, at which time District Manager Richard "Dick" Pouliot assigned Theresa Kruft, who had no personnel experience and had been hired by Jeffries three months earlier as an entry-level Customer Service Manager, to fill Terry's position during her leave. After a brief return to work, Terry resigned from Wal–Mart in March 1997. Kruft and Jeffries both applied to fill Terry's position permanently. Sensing that store manager Don Davis did not like her because she is black, Jeffries began to fear

Before BOGGS and MOORE, Circuit Judges, and BELL, District Judge.[*]

BOGGS, Circuit Judge.

Amy Ruth Jeffries sued her employer for unlawful race discrimination and retaliation under Title VII and largely parallel provisions of Ohio law. A jury returned a verdict for Jeffries on the retaliation claim and awarded $8500 in compensatory damages and $425,000 in punitive damages. Wal–Mart appealed. Because the record contained evidence on which the jury could base its findings of retaliation and punitive-damages liability, we affirm.

[*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

being passed over for a job she perceived as rightfully hers. Although Wal–Mart's decision had not been announced (it had already been made), Jeffries scheduled a meeting with the Ohio Civil Rights Commission ("OCRC") to ascertain her options if she did not receive the promotion. The meeting was set for the following week, after Easter Sunday. Her intention to file a civil-rights charge if she did not obtain the promotion became known at the store, although the record does not reveal whether Jeffries mentioned it to a friendly co-worker or addressed comments directly to decision-making personnel.

On Good Friday, March 27, 1997, District Manager Pouliot visited the Fairlawn store. Jeffries planned to speak to him about what she perceived as a delay in making the Personnel Manager decision, but events took an unexpected turn. According to assistant store manager and Jeffries's one-time personal friend Kirk Williams, he began speaking with Jeffries about scheduling problems on the courtesy desk over the busy holiday weekend, but she seemed distracted. He claimed that Jeffries started saying negative things about Wal–Mart and the people who worked there. When he asked if she would be working on Saturday and she demurred, saying that she had too many other things to do that weekend, Williams seized her employee badge, clocked her out, and instructed her to take the rest of the day off. Later, he decided that things had gotten out of hand and told Jeffries that "if she felt that vehement about staying, then she could stay." Jeffries told a similar story but characterized Williams as having flown into a rage and described Williams's attempt to treat the event like a joke as a "whitewash."

Too upset to remain at work after the brouhaha, Jeffries went home and called Wal–Mart's home office in Bentonville, Arkansas, to report the events. Regional Personnel Manager Martin Roberts took the call and assured Jeffries that "someone from Bentonville" would meet her at the Fairlawn store on Monday, her next scheduled workday, to look into the matter. On Monday, Jeffries received official word that Wal–Mart had promoted Kruft. She never heard from anyone "from Bentonville." By Wednesday, Jeffries decided that the stress from the Good Friday incident had become too much, so she took medical leave through April 20, 1997. During her leave, she wrote to District Manager Pouliot to complain about the Good Friday incident and, on April 14, 1997, filed a charge with the OCRC concerning the Good Friday incident and Wal–Mart's allegedly discriminatory failure to promote her.

Upon her April 20, 1997, return to work, Jeffries found her office cleaned out, her scheduling duties revoked, and her computer access curtailed. In her view, manager Davis and assistant manager Williams had become far less supportive and had started looking for things to "pick" her about. On April 28th, Jeffries asked for and received a transfer to the jewelry department "to escape the harassment."

Wal–Mart's answer to the OCRC charge accused Jeffries of displaying favoritism in handling employees, which supposedly justified not promoting her to Personnel Manager. When she learned of Wal–Mart's position, she drew up and brought to work a statement attesting to her fairness, which garnered the signatures of 77 employees, including 17 managers, by day's end. Williams and Davis considered Jeffries guilty of passing a petition in violation of Wal–Mart rules concerning proper use of company time and disciplined her with a written reprimand. Jeffries com-

plained that such a severe method of "coaching" for a first infraction was unnecessary and had inappropriately skipped past less significant forms of discipline: "coaching for success" and "coaching for improvement" with a verbal reprimand.

In August 1997, after only a few months in her new role, Kruft gave notice of her intention to leave the Personnel Manager job, so Jeffries "let everybody know [that she was] interested in th[e] position." She entered her application in the computer and, "just to make sure I cover myself," wrote Dick Pouliot again requesting "an opportunity to interview for Personnel." Wal–Mart claims that Jeffries was ineligible for the promotion to replace Kruft because company policy prohibited promoting someone who had a written reprimand less than six months old in her file and also prohibited transferring someone twice within six months. Williams conceded that management has discretion to lift these two bars to advancement. Apparently Wal–Mart did not exercise this discretion in Jeffries's favor, as the company hired Tiana Ferrell, a Caucasian without any personnel experience, in late July 1997. Ferrell's tenure as Personnel Manager proved short-lived: she left in September. On November 11, 1997, Wal–Mart promoted Troy Denefield, who is black, to replace Ferrell. According to Jeffries, this violated company policy insofar as Denefield, who had no personnel experience, had been hired by Kruft just five months before his promotion and Wal–Mart generally requires six months of service before consideration for a promotion.

Jeffries's discrimination charges proceeded to litigation in the district court. Her discriminatory failure-to-promote claim with respect to the August 1997 promotion of Tiana Ferrell survived Wal–Mart's motion for summary judgment. The district court held that a genuine issue

of material fact existed with respect to whether Jeffries was responsible for circulating the petition after bringing it to the store, such that Wal–Mart's articulated reason for denying her the promotion, existence of the written reprimand in her file, might not be a legitimate *non-discriminatory* reason for rejecting Jeffries and promoting Ferrell. Additionally, the court held that the discretionary nature of policy enforcement meant that a genuine issue remained as to whether the write-up in Jeffries's file was severe enough to justify barring her from consideration for a promotion, meaning that Wal–Mart's proffered reason might be a pretext for discrimination. Wal–Mart did not move for summary judgment on Jeffries's retaliation claims relating to the promotions of Ferrell and Denefield. These three claims, among others unrelated to this appeal, proceeded to trial. The jury returned a verdict in Wal–Mart's favor on the discrimination claim arising from the promotion of Tiana Ferrell. However, the jury found in Jeffries's favor on the retaliation claim, awarding $8500 in compensatory and $425,000 in punitive damages. After denial of its renewed motion for judgment as a matter of law, *see* Fed. R.Civ.P. 50(b), Wal–Mart timely appealed.

## II

This court reviews de novo a district court's grant or denial of a motion for judgment as a matter of law, applying the same standard as the district court. *See K & T Enters. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996). Viewing the evidence in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences, if the jury's verdict lacks a legally sufficient basis in the evidence, the court will grant judgment as a matter of law. *See Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846,

849 (6th Cir.1998). "[A] court should refrain from interfering with the jury's verdict unless it is clear that the jury reached a seriously erroneous result." *Brooks v. Toyotomi Co.*, 86 F.3d 582, 588 (6th Cir. 1996).

Wal–Mart argues that Jeffries failed to prove unlawful retaliation because 1) the actions she took before filing a charge with the OCRC were not protected activities, 2) she failed to demonstrate a causal connection between the protected activities and any adverse employment action, 3) no adverse employment actions were taken by Wal–Mart after Jeffries filed her claim with the OCRC, and 4) Wal–Mart presented un-rebutted evidence of a legitimate non-discriminatory reason, *i.e.*, Jeffries introduced no evidence suggesting that Wal–Mart's proffered reasons were pretextual. Wal–Mart additionally argues that the jury's award of punitive damages lacked evidentiary support and was unconstitutionally excessive.

## A

Title 42 U.S.C. § 2000e–3(a) prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" in connection with an unlawful employment practice. To establish a prima facie case of retaliation, a plaintiff must produce evidence showing: "(1) that he engaged in an activity protected by Title VII; (2) that this exercise of his protected civil rights was known to defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *See Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990) (citing *Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987), and *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793 (9th Cir.1982)). "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen*, 686 F.2d at 797. "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co.*, 683 F.2d 339, 343 (10th Cir.1982) (citing *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980), and *Womack v. Munson*, 619 F.2d 1292, 1296 & n. 6 (8th Cir.1980)). While "proximity in time between protected activity and adverse employment action may give rise to an inference of causation," *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987), the mere fact that an adverse employment action occurs subsequent to the protected activity does not, standing alone, support a finding of retaliation. *See Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir.1986). Consistent with the *McDonnell–Douglas* analytical method, once a plaintiff makes out a prima facie case, the employer must articulate a legitimate non-retaliatory reason for the adverse action, which articulation will shift the burden of production back onto the plaintiff to show that the articulated reason is merely pretext for retaliation. *See Thatcher v. Goodwill Indus., Inc.*, 117 Ohio App.3d 525, 690 N.E.2d 1320, 1327 (1997).

### 1. Protected Activity

Wal–Mart asserts that "a large portion of the evidence" Jeffries relies on to support her retaliation claim related to events that occurred between the time she "advised Wal–Mart" of her intention to pursue

a civil rights claim and the day she actually filed the claim, April 14, 1997. Wal–Mart argues that no activities undertaken prior to Jeffries's filing of her claim constitute a "protected activity" within the meaning of § 2000e–3 because Jeffries did not use her contact with the OCRC in a protective manner but instead attempted to use it offensively to coerce Wal–Mart into giving her the promotion. Wal–Mart expresses concern that, were this court to hold Jeffries's actions protected, employees would be able to use the threat of a civil rights claim to obtain preferential treatment from their employers. Indeed, Wal–Mart maintains that Jeffries contacted the OCRC and made her intention to file a charge known at the store in order to extort Wal–Mart into giving her the promotion it had already decided should go to Kruft. For her part, Jeffries argues that formation of a definite intent to file a charge (contingent upon her not receiving the promotion) qualifies as protected activity because "[t]here is nothing talismanic about the filing of a charge." *Croushorn v. Board of Trustees*, 518 F.Supp. 9, 22 (M.D.Tenn. 1980); *see also Coleman v. Wayne State Univ.*, 664 F.Supp. 1082, 1092 n. 5 (E.D.Mich.1987).

The *Croushorn* court drew a careful distinction between a definite intent to file a charge and intent to file a charge conditioned upon future action by the employer, finding the latter worthy of only "opposition clause" protections, rather than the broader "participation clause" protections afforded to a firm intent to file. *See Croushorn*, 518 F.Supp. at 24. Although the record does not conclusively show whether Jeffries designedly made her "intention to file" known around the store in hopes of forcing Wal–Mart's hand, it strongly suggests that her intent to file an OCRC charge was conditioned on her not getting the promotion. Still, the opposition/participation distinction is not at issue in this case because Wal–Mart has not argued that the narrower opposition clause leaves Jeffries without legal protection.

The district court's grant of summary judgment to Wal–Mart with respect to Jeffries's race-discrimination claim arising out of the Kruft promotion shows that the "discrimination" she opposed was not unlawful, which fact *may* leave her intended complaint to the OCRC outside the opposition clause's protections. Had Wal–Mart raised such an argument, it *could have* led to a holding that Jeffries's intention to file a charge with the OCRC was not, under the circumstances of this case, a "protected activity" because the conduct she opposed was not even arguably unlawful. Since Wal–Mart did not present such an argument, we need not resolve the issue. We pause only to observe that even if Wal–Mart had succeeded in arguing that Jeffries's (probably conditional) intention to file an OCRC charge was not a protected activity, such a conclusion would not result in judgment for Wal–Mart. This case involves much more than pre-charge activity producing retaliatory conduct.

Jeffries's retaliation claims relate to Wal–Mart's failure to promote her on the occasions it promoted Ferrell (August 1997) and Denefield (November 1997), not to the Kruft promotion that occurred contemporaneously with her making an appointment with the OCRC. Since Jeffries filed her OCRC charge on April 14, 1997, she had engaged in indisputably protected activity four months prior to the time Wal–Mart passed her over to promote Ferrell. Accordingly, we need not and do not address the question of whether actions taken by Jeffries prior to April 14, 1987, come within the § 2000e–3 definition of "protected activity."

■ Although Wal–Mart argues that events occurring prior to Jeffries's filing

the OCRC charge (such as the Good Friday incident) should not be considered in assessing the evidentiary support for the retaliation claim, it has argued for that proposition on policy grounds alone and has cited no supporting authority. Since the pre-charge evidence was properly admitted as relevant to the race-discrimination claim and Wal–Mart did not seek a limiting instruction during trial or in the jury charge, Wal–Mart has waived this issue. In any event, we detect no error.

 The trier of fact may consider an employer's response to an employee's threat to file a charge in assessing whether later adverse employment actions constituted retaliation for the charge actually filed, be that charge baseless or meritorious. The proffered inference makes logical sense: Wal–Mart was disturbed by its employee's combative threat to file a charge if she did not obtain a promotion and became utterly determined to prevent her from getting the job once she actually filed the charge and forced the company to defend its actions. On the other hand, Wal–Mart could argue that Jeffries's litigiousness had nothing to do with opposition to discrimination and everything to do with extorting the company into giving her a promotion, so that Wal–Mart retaliated for her extortion rather than her opposition to discrimination. Of course, such a dispute is quintessentially one of fact. Thus, even if the pre-charge contact with the OCRC did not qualify as protected activity, evidence relating to the Good Friday incident, which occurred after Jef-

fries's preliminary contact with the OCRC had become known at the store, could aid a jury in assessing whether Wal–Mart's later written reprimand and the denial of a promotion based thereon constituted retaliation for Jeffries's filing a race-discrimination charge relating to the Kruft promotion.

## 2. Causal Connection

Wal–Mart argues that the alleged retaliatory acts—the coaching with a written reprimand, the Ferrell promotion, and the Denefield promotion—that occurred after Jeffries filed her charge occurred so long after the protected activity—two months, four months, and seven months, respectively—that a causal-connection inference should not arise.

Jeffries first points to her return to work on April 20, 1997 (nine days after the OCRC charge). As she relates it, she discovered that Wal–Mart had "cleaned out her office, revoked her scheduling responsibilities, and curtailed her personnel privileges on the computer."[1] She also considered managers Davis and Williams unsupportive of judgment calls she made in the course of her duties as lead Customer Service Manager, a view shared by several witnesses who testified at trial. Next Jeffries characterized the written-reprimand coaching session as both illegitimate, because Wal–Mart's policy on "solicitation" arguably permitted her actions, and unduly severe, because she had not first been "coached for success" or "coached for improvement."[2] Finally, Jef-

---

1. Wal–Mart contends that her "office" was actually an electrical utility closet in which Jeffries had set up a table on which she left certain papers relating to the duties she had assumed under the supervision of out-going Personnel Manager Patty Terry. Wal–Mart also notes that the filing cabinet kept in the closet belonged to the company, not Jeffries, and that it had been removed in January

1997. Wal–Mart's remonstrance notwithstanding, a jury could have concluded that the company had significantly reduced material responsibilities of Jeffries's job and revoked a material benefit.

2. Wal–Mart claims that company policy specifically prohibited associates from engaging in solicitation or distribution of literature dur-

fries described the Ferrell promotion (approximately one month after the coaching session and four months after the OCRC charge) and the Denefield promotion (seven months after the charge) as retaliatory insofar as underqualified people received a promotion for which Jeffries was qualified.

■ Wal–Mart characterizes Jeffries's move to the jewelry department (14 days post-charge) and subsequent pay raise (90 days post-charge) as a promotion that supposedly defeats any causal link between the charge and the subsequent adverse employment actions. While an intervening promotion may *undermine* the strength of the inference, Wal–Mart has cited no authority for the proposition that such a promotion *defeats, as a matter of law,* the causal link between a protected activity and a subsequent adverse employment action.[3] Furthermore, Jeffries has always maintained that management's retaliatory non-support of her judgment calls forced her to apply for the move to jewelry, which a different manager supervised, in order to escape harassment from Williams and Davis. Finally, Jeffries introduced evidence that the "promotion" to jewelry was at best a lateral move (her wages would have decreased in the move but for a company policy banning such pay reductions) and that her new manager

gave her the raise after three months of satisfactory performance.

■ The removal of items from what had theretofore been Jeffries's "office," the cancellation of personnel responsibilities, and the unsupportive behavior of Davis and Williams certainly occurred within such temporal proximity to the OCRC filing as would permit a factfinder to make an inference of a causal connection. Moreover, Jeffries relied on the entire sequence of events following her filing as circumstantial evidence of retaliation. Essentially, Jeffries argued that retaliatory harassment combined with actual adverse employment actions together gave rise to the inference of causation necessary to support a prima facie case of retaliation. The record supports her contention.

Both parties have cited passages in the record that arguably support their view of the facts. The evidence cited, such as the events surrounding the written reprimand and the supposed retaliatory harassment, left open several questions for the jury, which could have concluded that the adverse actions were causally related to the plaintiff's protected activity. Wal–Mart was, therefore, not entitled to judgment as a matter of law for lack of causal connection.

ing work time and that violations of the policy had previously led to termination of associates. Furthermore, according to Wal–Mart, Jeffries's violation of the solicitation policy was classified as "serious misconduct," and company rules provide that serious misconduct warrants at least a level 3 reprimand (written coaching). Since Wal–Mart did not produce an uncontested statement of unambiguous company policy, the jury could have agreed with Jeffries's interpretation. Moreover, as the district court noted, assistant manager Williams recognized management's discretion to waive the written-reprimand bar to promotion, and the jury could have believed that Wal–Mart properly disciplined Jeffries but, in retaliation for Jeffries engaging in protected activity, refused to waive the bar.

3. The case Wal–Mart cites, *Smith v. City of Dayton,* 37 F.3d 1499 (table), No. 93–3639, 1994 WL 540666 at *6 (6th Cir. Oct. 3, 1994), held only that the magistrate judge presiding over a bench trial did not commit clear error when he found that the plaintiff had failed to establish causation where significant time had elapsed between the protected activity and the adverse employment action and, in addition, the plaintiff failed to show that she had been treated differently from other applicants for a job and had meanwhile enjoyed certain career-enhancing opportunities.

### 3. Adverse Employment Actions

██ This court has long held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis v. Multi-Care Mgm't, Inc.*, 97 F.3d 876, 885 (6th Cir.1996) (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987)); *see also Darnell v. Campbell County Fiscal Court*, 731 F.Supp. 1309, 1313 (E.D.Ky.1990), *aff'd*, 924 F.2d 1057 (6th Cir.1991). This circuit has adopted the Seventh Circuit's standard for assessing actions alleged to be a "materially adverse" employment action. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 661–62 (6th Cir.1999); *Kocsis*, 97 F.3d at 886 (quoting with approval *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)). The Seventh Circuit "listed certain factors to consider in determining whether an employment action was materially adverse: 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Kocsis*, 97 F.3d at 886 (quoting *Crady*). Of course, "a change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Ibid.*[4]

██ Wal–Mart notes that none of the alleged adverse employment actions resulted in a decrease in salary, a point Jeffries concedes. It also claims that none of the alleged retaliatory incidents resulted in "significantly diminished material job responsibilities." Yet Wal–Mart ignores the fact that, just days after the OCRC charge was filed, it blocked Jeffries's access to various personnel-management-related computer programs and eliminated her responsibilities for those matters assigned to her, apparently for training purposes, by Patty Terry. Additionally, under Jeffries's theory of the case, which evidence in the record supports, Wal–Mart's reaction to her gathering of support to rebut Wal–Mart's claims presented to the OCRC was either inappropriate or overblown. This allegedly retaliatory act imposed on Jeffries a bar that blocked her from consideration for the promotions that went to Ferrell and Denefield, under Wal–Mart's (waivable) policy barring promotions for recent recipients of written reprimands. Jeffries also argued that managers Davis and Williams engaged in retaliatory harassment that essentially forced her to apply for the jewelry department position, which created a second (waivable) bar to her obtaining the promotion she sought. Because Jeffries did not claim that Wal–Mart constructively demoted her into the jewelry department but instead argued that Wal–Mart's retaliatory conduct created improper bars to her promotion, Wal–Mart's arguments about a lack of material changes in employment conditions are inapposite. This case concerns retaliatory failure to promote. Wal–Mart has not argued, nor can it, that a failure to promote someone because of her protected activities does not constitute an adverse employment action. The failures to promote when Ferrell and Denefield obtained the personnel manager position, if unjustified because they relied on actions caused by or constituting retaliation, are classic examples of adverse employment actions in-

---

4. *Kocsis* affirmed summary judgment for an employer on a disability-discrimination claim because the reassignment the employee complained of left her with the same or greater compensation, her duties were not materially modified, she submitted no evidence that she lost public prestige, and she made no real attempt to compare her new and former positions. *Id.* at 886–87.

asmuch as Jeffries was otherwise qualified for the job and did not get it.

### 4. Legitimate Non–Discriminatory Reasons

Assuming that Jeffries made out a prima facie case, Wal–Mart argues that it presented "unrebutted evidence that it had legitimate non-discriminatory reasons for its actions." We construe this as an argument that Jeffries failed to present any evidence of pretext, leaving Wal–Mart entitled to judgment as a matter of law.

■ To justify its refusal to promote Jeffries at the time of the Ferrell promotion, Wal–Mart relied on a company policy barring promotion of associates who had in their file a written reprimand less than six months old. Wal–Mart contends that "the record is undisputed that the circulation of petitions on company time was against corporate policy," and that company policy mandated a written coaching session. At trial, Jeffries introduced evidence that no other associate had been disciplined for passing items such as get-well cards for signature on work time, that the policy prohibiting passing of petitions did not exist at the time she brought copies of the note in question to work, that she did not knowingly violate a company policy because she thought her actions were permitted, and that the appropriate reprimand for such a first offense was a verbal warning. The portions of the record Wal–Mart cited do not support its contention that Jeffries indisputably deserved a written reprimand, and Wal–Mart has not presented this court with the relevant portions of then-applicable employee handbooks and company policies that could resolve the conflicting testimony on the matter. Moreover, since the jury could have found that the reprimand in Jeffries's file was itself retaliatory, its presence cannot stand as an irrefutably non-retaliatory reason for failing to promote. That is, Jeffries introduced evidence that the stated reason for rejecting her was pretext for retaliation, especially in light of the fact that, even if the reprimand were appropriate, store management had discretion to waive enforcement of the policy just as it had for two other employees who received promotions.

Wal–Mart also contends that the two people responsible for promoting Ferrell and Denefield did not know of Jeffries's interest in the position, such that her not getting it could not have been retaliatory. Evidence introduced at trial showed that Jeffries applied for the promotion by entering her application in the appropriate computer file. Testimony at trial indicated that her computer-based application would have been rejected by the computer because she admitted having a fresh written reprimand in her file, yet management may have seen that she had attempted to apply but failed the threshold question. Since Jeffries argues that the reprimand itself was retaliatory, the fact that the reprimand prevented the decision-makers from knowing of her interest cannot stand as a legitimate non-retaliatory reason because their lack of knowledge depends on the computer's rejection of her application, which resulted from, in Jeffries's view, prior retaliation. Finally, Jeffries also sent a letter advising District Manager Dick Pouliot of her interest in the job in hopes that he would oversee the promotion decision. Thus, even if the immediate decision-makers did not know of Jeffries's interest, the company did know because, under the circumstances, she complied with company procedures for expressing interest in the job and separately put higher management familiar with the situation on notice of her interest.

### B. Punitive Damages

For plaintiffs who did not obtain compensatory or punitive damages under 42

U.S.C. § 1981 but prevailed in a Title VII action other than one relying on the disparate impact theory of discrimination, § 1981a permits but limits compensatory and punitive-damage awards. *See* 42 U.S.C. §§ 1981a(a)(1), 1981a(b)(3)(D) (as against defendants employing more than 500 employees, capping compensatory and punitive damages, exclusive of a backpay award, at $300,000). Although Ohio law uses the federal standard for determining punitive-damages liability, it does not cap the amount of a jury's award.[5]

To recover punitive damages, a plaintiff must demonstrate that his employer engaged in a discriminatory practice " 'with malice or with reckless indifference to the [plaintiff's] federally protected rights.' " *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (quoting 42 U.S.C. § 1981a(b)(1) (resolving a circuit split and rejecting the argument that conduct must be egregious to support a punitive damages award)). "[I]n the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536. Examples of intentional discrimination that do not constitute reckless disregard for federally protected rights include an employer who is unaware of federal law, who believes that his discrimination is lawful, who believes his discrimination comes within the bona fide occupational qualification defense, or who believes a statutory exception applies. *See id.* at 536–37. Although egregious conduct is not a prerequisite for a punitive damages award, a plaintiff can introduce evidence of egregious conduct in order for the jury to draw an inference about the defendant's malice or reckless indifference to the plaintiff's rights. *See id.* at 538–39 ("To be sure, egregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive."). From the evidence adduced at trial, the jury could conclude that Wal–Mart engaged in the following pattern of behavior, which was egregious: after cleaning out her office, reducing her responsibilities, becoming harassingly unsupportive, and effectively forcing her to transfer to the jewelry department, managers used an undeserved written reprimand for arguably appropriate behavior (Jeffries's circulating a petition) and the previous retaliatory forced transfer as pretexts to prevent Jeffries's long-sought advancement even when the candidates who were actually promoted were two people with no personnel management experience at all, one of whom was a recent hire promoted in violation of Wal–Mart's own six-month rule. All of this occurred despite Jeffries's repeated protestations and with the actual or tacit approval of District Manager Pouliot and, to a certain extent, Bentonville-based Re-

---

**5.** Jeffries filed suit under Title VII, § 1981, and the largely parallel provisions of Ohio law. *See* O.R.C. § 4112. The same standards and methods of analysis apply to both the state and federal claims, *see Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *In re Brantley,* 34 Ohio App.3d 320, 518 N.E.2d 602 (Ohio Ct.App.1987), and *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)), so we have addressed them as essentially identical. One point of difference, however, is the statutory limitation on punitive damages. Relying on the Ohio Supreme Court's decision striking down statutory damages limits as violative of the Ohio constitutional right to jury trials in civil matters, *see Ohio Acad. of Trial Lawyers v. Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062 (Ohio 1999), the district court held that the jury's punitive damage award was not subject to the § 1981a(b)(3)(D) cap of $300,000. Wal–Mart has not appealed the district court's holding in this regard. Although we express no opinion on its merits, we proceed on the assumption that the district court's holding was correct.

gional Manager Roberts. Viewing the evidence in the light most favorable to Jeffries, the jury could have concluded that Wal–Mart engaged in a pattern of calculated retaliatory conduct so egregious as to be in reckless disregard of Jeffries's right to be free from retaliation.

 "The inquiry does not end with a showing of the requisite 'malice or ... reckless indifference' on the part of certain individuals, however. The plaintiff must impute liability for punitive damages to respondent.... [C]ommon law limitations on a principal's liability in punitive awards for the acts of its agents apply in the Title VII context." *Id.* at 539 (citation omitted). Consistent with prior Title VII decisions relating to imputed liability, *see Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Court looked to RESTATEMENT (SECOND) OF AGENCY, § 217(C) for guidance. That section provides:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if: (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.

RESTATEMENT (SECOND) OF AGENCY, § 217(C). As to the managerial-capacity form of imputed liability, the Court commented:

> Unfortunately, no good definition of what constitutes a "managerial capacity" has been found, and determining whether an employee meets this description requires a fact-intensive inquiry. In

making this determination, the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished. Suffice it to say here ... that an employee must be "important," but perhaps need not be the employer's "top management, officers, or directors," to be acting "in a managerial capacity."

*Kolstad,* 527 U.S. at 543 (citations omitted).

Wal–Mart relies on *Dudley v. Wal–Mart Stores, Inc.,* 166 F.3d 1317 (11th Cir.1999), to support its argument that no one high enough on the corporate ladder engaged in unlawful retaliation and that, therefore, punitive damages are not permissible. *Dudley* contains two holdings respecting the standards of liability for punitive damages rejected by the Supreme Court in *Kolstad: Dudley* required plaintiffs to show egregious conduct by the employer to support a punitive-damages award and to show "either that the discriminating employee was 'high[ ] up the corporate hierarchy,' or that 'higher management' countenanced or approved [his] behavior." *Id.* at 1323 & n. 8 (holding the *Faragher* vicarious liability rules inapplicable to Title VII punitive-damage awards and holding that store managers were not sufficiently high in the corporate hierarchy to sustain punitive damages). *Kolstad,* which was pending before the Supreme Court when the Eleventh Circuit decided *Dudley,* rejected the egregiousness requirement in favor of the *Ellerth–Faragher* vicarious liability rules, *see Kolstad,* 527 U.S. at 535, and endorsed a flexible understanding of "managerial capacity" that seems to recognize Wal–Mart store managers as sufficiently "important," *see id.* at 543. Thus, Wal–Mart has failed to cite competent authority supporting its argument. In any event, the record contained evidence from

which a jury could have found that store managers Williams and Davis acted in a "managerial capacity" or that District Manager Dick Pouliot and the Bentonville-based Regional Personnel Manager Martin Roberts, both of whom knew of Jeffries's concerns about discrimination at the store and did nothing to address or even investigate them, were Wal–Mart managerial agents who "ratified or approved" of Williams and Davis's retaliatory actions. Thus, the punitive damages verdict can stand on either of two forms of imputed liability: "the agent was employed in a managerial capacity" or the "principal or a managerial agent of the principal ratified or approved the act." RESTATEMENT (SECOND) OF AGENCY, § 217(C)(c) and 217(C)(d).

▇ Wal–Mart next argues that the jury's punitive-damages award of $425,000 for conduct that garnered only an $8500 compensatory-damages award, a 50:1 ratio, violates constitutional due process. Wal–Mart relies only on the large ratio, comparing it to the 500:1 punitive:compensatory ratio in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

> The Supreme Court has consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we

> return to what we said ... in [*Pacific Mutual Life Ins. Co. v.*] *Haslip* [499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)]: 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus.'" In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. When the ratio is a breathtaking 500 to 1, however, the award must surely "raise a suspicious judicial eyebrow."

*Id.* at 582–583 (other internal citations omitted). Despite this clear statement from the Supreme Court that a high ratio—even a "breathtaking" one of 500:1—will not, by itself, offend constitutional due process, Wal–Mart has ignored all of the other factors identified in *BMW* for assessing the constitutional propriety of punitive-damages awards and has relied solely on the numbers. The Supreme Court recently reaffirmed that courts of appeals should conduct de novo review of a district court's conclusion that a jury's verdict did not offend the Due Process Clause of the Constitution. *See Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001). We have done so, and Wal–Mart's argument has failed to convince us.

### III

For the reasons set forth above, we **AFFIRM** the judgment of the district court in all respects.

MOORE, Circuit Judge, concurring.

I concur fully in Judge Boggs's opinion. I emphasize that we have no occasion in

this case to address any possible opposition/participation distinction.

BELL, Chief District Court Judge, concurring in part and dissenting in part.

Although I concur with the majority as to the appropriateness of the jury's compensatory award, I find no support in the record for the jury's award of punitive damages in this case. Under 42 U.S.C. § 1981a, a plaintiff must prove either "malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Yet, after a recitation of the meaning of this standard as enunciated in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535–36, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the majority fails to indicate what evidence, if any, was introduced at trial upon which a reasonable jury could make such a finding of malice or reckless indifference. Given that the record is devoid of evidence indicating that Defendant's employees ever knew of the existence of the federally protected right at issue in the case, there is nothing upon which the jury could base its conclusion that Defendant, or its employees, acted with malice or reckless disregard in relationship to Plaintiff.

In addition, the punitive damages award of $425,000, an amount 50 times greater than the compensatory damages award, is so grossly excessive in relationship to degree of reprehensibility of Defendant's conduct and so unreasonable in relationship to the actual harm inflicted on Plaintiff that it violates the Due Process Clause of the Fourteenth Amendment. Therefore, I must respectfully dissent as to the propriety of awarding punitive damages and the amount of award in this case.

## I. Punitive Damages under 42 U.S.C. § 1981a

As indicated by the majority, plaintiffs who do not obtain compensatory or punitive damages under 42 U.S.C. § 1981, but prevail in a Title VII action, may be awarded compensatory and punitive damages under 42 U.S.C. § 1981a. Implicit in the construction of the statute is the conclusion that being eligible for compensatory damages does not necessarily mean that a plaintiff may recover punitive damages. *Kolstad*, 527 U.S. at 534 ("The very structure of § 1981a suggests a congressional intent to authorize punitive damages in only a subset of cases involving intentional discrimination."). In order to be eligible for an award of punitive damages in cases of intentional employment discrimination, a plaintiff must prove that the employer engaged in the activity "with malice or reckless indifference to the federally protected rights" of the individual. 42 U.S.C. § 1981a (b)(1).

After describing the standard required for punitive damages under § 1981a, the majority then properly cites to and quotes from *Kolstad* to show how the Court is to interpret the meanings of "malice" and "reckless indifference" for purposes of § 1981a. As stated in *Kolstad*, "malice" and "reckless indifference" under the statute refer to "the employer's knowledge that it may be acting in violation of federal law, *NOT* its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535 (emphasis added). Thus, to gain the advantage of this section, a plaintiff must prove that "an employer ... discriminated in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536. Yet, instead of describing the evidence produced by Plaintiff that might suggest knowledge of federal Title VII law on the part of Defendant and its employees, the majority moves directly to the issue of whether Plaintiff can impute liability to Defendant for the acts of its employees.

The majority analysis misses the fundamental question: whether Plaintiff has produced any evidence of malice or reckless indifference on the part of Defendant's employees.

Here, Plaintiff has failed to put forth any evidence which would satisfy the "malice" or "reckless indifference" requirement of the statute. There is no evidence in the record from which a reasonable jury could infer that Defendant's employees, assistant manager Kirk Williams, store manager Don Davis, District Manager Richard Pouliot, or Regional Personnel Manager Martin Roberts, knew or perceived that their retaliatory actions against Plaintiff violated federal law or even Ohio state law. *See Robinson v. Instructional Systems, Inc.,* 80 F.Supp.2d 203, 209 (S.D.N.Y.2000) (declining to allow plaintiff to submit the issue of punitive damages to the jury due to lack of evidence of defendant's knowledge that it might be acting in violation of federal law prohibiting retaliation or New York administrative law). Although this burden of proving defendant's knowledge of the relevant federal law is "formidable, if not unattainable," the holding in *Kolstad* mandates as much. *Id.* at 210. Given the dictates of *Kolstad,* a showing of "malice"

or "reckless indifference" is a prerequisite to obtaining punitive damages. Because Plaintiff made no such showing that Defendant's employees had knowledge of the relevant federal law prohibiting retaliation or perceived a risk of violating such law by their actions, punitive damages are simply not available to Plaintiff.[1]

In the context of punitive damages under the statute, a plaintiff may also prove "malice" by introducing evidence of the "outrageous" or "egregious" behavior of a defendant to support an inference of an "evil motive." *Kolstad,* 527 U.S. at 537. Thus, a plaintiff can prove "malice" even in the absence of a showing that an employer or its employees knew of the specific federal prohibition. In this case, however, Plaintiff has provided no evidence of outrageous or egregious behavior on the part of Defendant. While failure to promote may be considered culpable behavior, it could not be reasonably seen as outrageous or egregious behavior. This is particularly so in light of the fact that Defendant Wal-Mart argues that it is company policy not to promote persons who had received a written reprimand or had been transferred once less than six months prior to the promotion possibility. In fact, when Plain-

---

1. *See Romano v. U–Haul Int.,* 233 F.3d 655, 669 (1st cir.2000) (upholding jury award of punitive damages because evidence suggested manager knew of corporation's anti-discrimination policies); *Zimmermann v. Assoc. First Capital Corp.,* 251 F.3d 376, ——–——, 2001 U.S.App. LEXIS 11292, at *23–*25 (2d Cir. 2001); *Lowery v. Circuit City Stores, Inc.,* 206 F.3d 431, 447 (4th Cir.2000) (plaintiff must show employer or employees had knowledge of existence of federal law in question to obtain punitive damages); *Virostek v. Liberty Township Police Dept.,* Case Nos. 99–3809, 99–3893, 2001 U.S.App. LEXIS 9866, at *31–*36, 2001 WL 549451 (6th Cir. May 14, 2001) (refusal by district court to give punitive damages instruction was abuse of discretion given evidence that defendant knew it was against federal law to demote or promote based on

gender); *Gile v. United Airlines, Inc.,* 213 F.3d 365, 375 (7th Cir.2000) (reversing the award of punitive damages due to lack of evidence of the requisite state of mind by employer); *Otting v. J.C. Penney Co.,* 223 F.3d 704, 711–12 (8th Cir.2000) (must show employer and employees acted with knowledge of federal law to impose punitive damages); *EEOC v. Wal-Mart Stores, Inc.,* 187 F.3d 1241, 1246 (10th Cir.1999) (finding sufficient evidentiary basis for punitive damages because manager familiar with ADA and prohibitions against discrimination); *Bishop v. Bell Atlantic Corp.,* Case 143 F.Supp.2d 59, ——–——, 2001 U.S. Dist. LEXIS 6716, at *18–*19 (D.Me.2001) (declining to remit punitive damages award because managerial staff testified that they knew retaliatory discrimination illegal).

tiff requested a transfer to a different store department as manager after the filing of her claim with the Ohio Civil Rights Commission, the transfer was approved by the same persons she accused of racial and retaliatory discrimination. As such, no reasonable juror could have construed such actions as outrageous or egregious, and therefore this evidence does not support an inference of "evil motive" to justify the imposition of punitive damages in this case. *See Robinson,* 80 F.Supp.2d at 210.

In *Kolstad,* the United States Supreme Court also fleshed out specific situations in which, despite intentional discrimination, the application of punitive damages is inappropriate: (1) the employer is not aware of the relevant federal prohibition; (2) the employer discriminates in the belief that the discrimination is lawful; (3) the underlying theory of discrimination may be novel or poorly recognized; or (4) the "employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense." *Kolstad,* 527 U.S. at 536–37. In this retaliation context, it remains clearly plausible that Defendant's employees were entirely unaware of Title VII's prohibitions against retaliation. Plaintiff produced no evidence to the contrary. Indeed, it is much more probable that Defendant's employees believed it to be within the law to prohibit Plaintiff's promotion due to the company policies regarding promotion.

Implicit within the language of § 1981a is a two-tiered structure for damages: one for compensatory damages and one for punitive damages. The decision in *Kolstad* provided potential § 1981a plaintiffs with a map of how to find and climb the stairs of this structure to get to the second-story punitive damages level. Without requiring a plaintiff to show the requisite culpable mental state of a defendant before receiving punitive damages is to essentially eliminate the second floor of this statute, and conflate the statute into a single story structure; something *Kolstad* expressly declined to do. Plaintiff has provided no evidence that Defendant's employees knew of the federal prohibition against retaliation, or the state prohibitions for that matter, and none of the actions taken by Defendant's employees could lead a reasonable juror to infer "evil intent." Therefore, punitive damages are not available to Plaintiff and I would reverse the District Court's decision, and grant Defendant's Motion for Judgment as a Matter of Law on the issue of punitive damages.

## II. Due Process

Defendant argues that the jury's award of $425,000, when contrasted with the compensatory award of $8,500, violates the Due Process Clause of the Fourteenth Amendment according to the standards set forth in the United States Supreme Court's decision in *BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Plaintiff contends that a 50:1 ratio does not cause "judicial eyebrows" to rise, that the ratio, alone, is not excessive given what she considers a low compensatory award, and that the ratio is within an acceptable range according to the Constitution. In support, Plaintiff cites to *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), *United States v. Big D Enterprises, Inc.,* 184 F.3d 924, 933 (8th Cir.1999), and *Continental Trend Resources Inc. v. OXY USA, Inc.,* 101 F.3d 634, 641 (10th Cir.1996).

The majority focuses on Defendant's use of the 50:1 ratio. According to the majority, because Defendant does not explicitly discuss the other two factors in *Gore,* its argument is unpersuasive, and concludes

that such a ratio does not offend due process. I conclude, based on the three *Gore* factors, referenced but not explained in detail by Defendant, that the punitive damage award of $425,000 is grossly excessive and therefore violates the Due Process Clause of the Fourteenth Amendment.

In *Gore*, the Supreme Court identified three factors which courts should use to analyze the circumstances surrounding the awarding of punitive damages to determine if such an award violates the Due Process Clause because it is grossly excessive. *Gore*, 517 U.S. at 575. The factors are: (1) the degree of reprehensibility of the conduct; (2) the ratio of punitive damages to actual, or potential, harm inflicted; and (3) other possible sanctions, civil or criminal, for comparable misconduct. *Id; Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 445 (6th Cir.2000).

The first *Gore* factor is perhaps "the most important indicium of the reasonableness of a punitive damages award ...." *Gore*, 517 U.S. at 576. As indicated in my dissent on the issue of punitive damages under § 1981a, there is no evidence in the record that could lead a reasonable jury to conclude that Defendant or its employees acted with "malice" or "reckless indifference" as to Plaintiff's rights under federal law or even state law. Without evidence to support such a finding, it is difficult to conceive how Defendant's, or its employees', actions here were of such a reprehensible nature as to warrant $425,000 in punitive damages. Thus, factor one militates against the award of $425,000 in punitive damages in this case. *See Rubenstein v. Admin. of the Tulane Educ. Fund*, 218 F.3d 392, 407 (5th Cir.2000) (indication that supervisor had ill-will towards plaintiff, and supervisor acknowledged that what was normally a performance-based raise, was declined due to plaintiff exercis-

ing his rights demonstrated a high degree of reprehensibility).

While there is no specific formula or ratio that defines the reasonableness of a punitive damages award under *Gore* factor two, there does need to exist some reasonable relationship between the punitive damages and the compensatory damages. *Gore*, 517 U.S. at 582. Though it is true, as Plaintiff points out, that some courts have upheld awards with a greater than 50:1 ratio, the crucial inquiry here is a comparison of the punitive damage award to the actual damages suffered by Plaintiff plus the harm likely to result from Defendant's actions. *Id.* at 581. I see nothing in the record that indicates any reasonable relationship between the actual and potential damages suffered by Plaintiff and the punitive damage award. *See Riley v. Kurtz*, Case No. 98–1077, 1999 U.S.App. LEXIS 24341, at *18–*23, 1999 WL 801560 (6th Cir. Sept. 28, 1999).

Finally, under the third *Gore* factor, the lack of severity of other sanctions for Defendant's conduct here seems to indicate that a large punitive damages award is not justified. There is no possibility for imprisonment for such conduct, a fact that belies awarding such an amount in this case. *Gore*, 517 U.S. at 583. In addition, Congress placed a cap of $300,000 on punitive damages in § 1981a, suggesting that anything more would be oppressive and unreasonable. 42 U.S.C. § 1981a(b).

Given that all three of the *Gore* factors point to the punitive damages award in this case being grossly excessive, I would find that the award here violates Due Process.