*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RICHARD TISDALE,

　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

FEDERAL EXPRESS CORP.,

　　　　　　　*Defendant-Appellant.*

No. 03-6605

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 00-01219—Todd J. Campbell, District Judge.

Argued:  December 6, 2004

Decided and Filed:  July 14, 2005

Before:  MARTIN and MOORE, Circuit Judges; BELL, District Judge.<sup>*</sup>

---

**COUNSEL**

**ARGUED:**  Jay L. Grytdahl, FEDEX EXPRESS, Memphis, Tennessee, for Appellant.  David B. Lyons, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Jay L. Grytdahl, FEDEX EXPRESS, Memphis, Tennessee, Jeana M. Littrell, FEDERAL EXPRESS CORPORATION, Memphis, Tennessee, for Appellant.  David B. Lyons, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

　　　　KAREN NELSON MOORE, Circuit Judge.  In this case, Defendant-Appellant, Federal Express Corporation ("FedEx"), appeals a jury verdict in favor of Plaintiff-Appellee, Richard Tisdale ("Tisdale") as well as the award of $100,000 in punitive damages.  The jury found that FedEx violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, by terminating Tisdale in retaliation for his complaints about racially discriminatory management practices.  On appeal, FedEx argues that the district court erred in deciding several issues including: (1) the denial of its motion to dismiss and/or strike evidence of backpay for discovery abuse; (2) the denial of its motion for judgment as a matter of law on the grounds that the administrative remedy was unexhausted; (3) the denial of its motion for a new trial where the clear weight of the evidence did not support the jury's verdict; (4) the award of punitive damages; and finally, (5) certain

---

<sup>*</sup>The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

evidentiary rulings.  Upon review of all of FedEx's arguments, we conclude that the district court did not err on any of these issues, and thus we **AFFIRM** the jury verdict in favor of Tisdale and the grant of punitive damages.

## I.  BACKGROUND

From 1996 until 2000, Tisdale was employed as a handler and ramp transport driver ("RTD") at FedEx's Nashville distribution station (hereafter "BNART").  During his employment, Tisdale raised several concerns to management regarding the disparate treatment of its African-American employees at BNART.  Specifically, in 1998, Tisdale, who is African-American, complained to management that he was not paid for attending a FedEx driver training program, while white employees were.  He also complained to management that African-American employees were being passed over for promotion and advancement to either dispatcher or office positions.  Of the approximately thirty African-American employees at BNART, none served as managers or supervisors at this time.  In response to the complaints, FedEx sent an investigator from Atlanta to meet with the African-American employees at BNART to discuss the practices there, but no substantial changes were made.  At the end of 1999, the African-American employees at BNART boycotted the office Christmas party in protest of what they perceived were management's discriminatory practices.  Mr. Tim Stuthard ("Stuthard"), the operations manager of BNART, asked Tisdale why the African-American employees did not attend the party, to which Tisdale responded "[a] lot of people feel like if they are not going to be able to get some of those office jobs they don't want to sit down and have dinner with you."  Joint Appendix ("J.A.") at 565 (Trial Tr. Vol. I at 237).

On February 3, 2000, Frances Miller ("Miller"), the managing director of Air, Ground, & Freight Services for the Southcoast District, visited the BNART station and met with all the employees.  Stuthard, the operations manager and direct supervisor of Tisdale, attended the meeting.  Miller asked the assembled employees if there were any issues that they would like to discuss.  At that point, Tisdale stood up at the public gathering and stated he had concerns regarding how African-Americans were treated at BNART.  In response to his statements, Miller suggested that they talk privately following the meeting.

After the public meeting, Tisdale and another African-American driver, Lovie Hurt ("Hurt"), met with Miller and discussed their specific concerns.  Miller advised Tisdale and Hurt to put their concerns in writing and promised that FedEx would investigate.  On February 13, 2000, a letter, co-written by Tisdale, and signed by eighteen other employees, was sent to Miller documenting their allegations of discriminatory treatment at BNART.  Two days earlier, however, Tisdale had been suspended for suspected theft of FedEx property, and he was ultimately terminated.

FedEx's reasons for terminating Tisdale related to his involvement in the pallet-recycling program at BNART.  While FedEx uses its own customized containers to transport materials, the company receives large shipments from customers on pallets.[1]  When FedEx employees transfer the packages to a FedEx container, the pallets become waste.  Neither FedEx as a company, nor BNART specifically, had a policy regarding the disposal of the pallets, other than the general policy to dispose of waste in an environmentally-friendly manner.  Instead, as one BNART employee testified, "the pallets were stacked up on the dock[] [and] thrown into the dumpster."  J.A. at 428 (Trial Tr. Vol. I at 146).  In the past, one employee had even gathered the pallets, sold them to a recycler, and kept the proceeds.

In 1997, Tisdale decided to sell the pallets to a recycler and use the proceeds for an employee fund to pay for the company Christmas party, picnics, and other employee events.  A bank account

---

[1]A pallet is "a small, low, portable platform on which goods are placed for storage or moving, as in a warehouse or vehicle."  Random House Unabridged Dictionary 1398 (2d ed. 1993).

(hereafter "the FedEx pallet account") was set up in which Tisdale, and three other employees had check-writing privileges. The only restriction FedEx managers put on the four employees is that they could not profit from the program, but otherwise Tisdale "was told to do the pallet operation as [he saw] fit." J.A. at 601 (Trial Tr. Vol. I at 313). Tisdale would deliver the pallets and receive a check written out to him, which he would then deposit into the FedEx pallet account. Recognizing a profitable opportunity for himself, Tisdale collected discarded pallets from various other stores in the area during his off-hours and sold them to recyclers. Several other FedEx employees helped him in this endeavor during non-work hours as well. The pallet recyclers would write a single check to Tisdale, who would then deposit the amount for the FedEx pallets in the FedEx pallet account, and share the remaining amount with all the drivers who helped him in the after-hours enterprise. Management at BNART knew that Tisdale and other FedEx drivers were working for the pallet-recycling companies after work.

The FedEx pallet program was such a success that Tisdale received an employee award from Brett Gardner ("Gardner"), BNART's senior manager, in recognition of his efforts "to plan, organize, communicate and fund the 1998 'Second Annual BNART Christmas Party.'" J.A. at 909 (Memorandum from Gardner to Tisdale (Dec. 5, 1998)). In July 1999, Gardner assumed control of the FedEx pallet account from the employees, and thereafter received all the checks and invoices for the FedEx pallets and disbursed all the funds for the employee events. Thus, McKinney Lumber ("McKinney"), the chief purchaser of the used pallets, wrote checks for the FedEx pallets to Gardner and wrote checks to Tisdale only for the pallets collected after-hours by him and his fellow drivers.

In January 2000, Stuthard, an operations manager, became Tisdale's immediate supervisor and began an investigation into the pallet-recycling program. On February 3, 2000, following his private meeting with Tisdale and Hurt about racial tensions at the facility, Miller, the regional managing director, met with the managers of BNART, including Stuthard. At the meeting, Stuthard informed Miller of his belief that Tisdale was stealing from FedEx by selling used pallets from BNART and keeping the proceeds for himself. Miller told him to investigate further. On February 4, 2000, Stuthard visited McKinney and reviewed the checks paid to Tisdale for the pallets. Two days later, Stuthard sent an email to Jeff Werner, who worked in FedEx's personnel department, recounting his findings:

> I paid another visit to the location that Tisdale is selling pallets too[sic]. I'm about to blow you away. For the month of January, Mr. Tisdale has been paid $7,747.50 and Federal Express got $535.25. All the money Tisdale has made was off Federal Express owned property. What do you think about his nice little operation now? That's only $2000.00 per week or $100,000 tax free dollars per year. Keep in mind, Tisdale has no cost associated with this income. He has been using company owned vehicles and fuel. He has been paid delivering the pallets. I refuse to believe that Federal Express can't prosecute this man for stealing. As I said before, he is bigger than life itself at this location. I want to bring his little empire down! This is a sad commentary and complete failure on [sic] management to allow this activity. What can we do?

J.A. at 1061 (E-mail from Stuthard to Jeff Werner (Feb. 6, 2000)).[2] Stuthard sent the email without first discussing the situation with Gardner, his supervisor and the person overseeing the FedEx pallet account. The following day, Miller spoke with Gardner, who told Miller that he believed the FedEx pallet account was accurate given the number of pallets received at the BNART facility.

---

[2] Stuthard later admitted at trial that the numbers which he quoted in his email were inaccurate. J.A. at 500 (Trial Tr. Vol. II at 461). Specifically, FedEx received $1,573.25 for the sale of pallets in the month of January 2000. J.A. at 880, 885 (FedEx Pallet Account Bank Statement). Moreover, the check to Tisdale for his after-hours collections was shared with the other FedEx drivers who helped gather non-FedEx pallets in their spare time.

Nonetheless, that same day, Miller contacted Anita Gay Bynum ("Bynum"), the zone manager with FedEx's security division, and asked her to investigate the FedEx pallet account. On February 10, 2000, after speaking to Stuthard and Sam Wrather ("Wrather), the general manager for McKinney, Bynum interrogated Tisdale following his shift, from 10:00 P.M. to 1:00 A.M. Throughout the interview, Tisdale stated repeatedly that he believed that he had not confused FedEx pallets with the pallets he collected during his own time. Despite his denials, Bynum continued to press the issue:

[Bynum]:     Is there a possibility that you brought in a load of pallets and they were confused on these are Fed-Ex pallets or these are your pallets and maybe they wrote you a check.

[Tisdale]:    Not to my knowledge, not to my recollection.

[Bynum]:     Maybe you were tired and —

[Tisdale]:    Sometimes, sometimes they uh, they don't know if I'm working for them or if I done brought it over for Fed-Ex or. I see what you're saying, but not to my knowledge I hadn't —

                . . . .

[Bynum]:     Right, but, I'm saying maybe by possible, some type of accident or confusion and something you were maybe work out later that, or maybe you, after. Ya know, because you have to admit you're a busy man. Sometimes, I'm sure you wake up in the morning and you don't even know what day it is. You're just trying to figure out what job am I supposed to go to and what I have to do today, try to sort all of this through your mind. You grab some pallets, you know that they have to be taken down there. They write you a check, you pocket it. . . . They've written the check to me and this really should have been written to Fed-Ex. But you feel like well, if I say something now they may think that I'm doing something wrong. So ya know, what do I do? Well, I just don't say anything. . . .

[Tisdale]:    Not to my knowledge. I don't remember ever having going, confused, mixed up or anything. Not to say that it hasn't happened.

[Bynum]:     I think you're taking so many pallets over there, that you're getting them confused on what's Fed-Ex pallets and what's your pallets.

[Tisdale]:    Uh huh.

[Bynum]:     Ya see what I'm saying?

[Tisdale]:    Yeah.

                . . . .

[Bynum]:     I know but, now do you think maybe somehow that there's a possibility that they could have got something confused as far as what you're turning into them is this your personal pallets or your Fed-Ex pallets?

[Tisdale]:    Ummm, it might be a possibility. But what I'm saying is that I'm not 100% sure that it, that it's ever happened, I guess is what I'm trying to say —

                . . . .

[Bynum]:     Cause I don't think, Richard, I don't think that you're doing anything intentionally wrong here. Now have there been mistakes made, yeah, ya know I think as far as you trying to juggle all this different stuff around that you don't know who's pallets you've got, ya know at certain times. Ya know, you take these pallets over there, they unload them, go, the next day you're picking up checks. You're dropping off more pallets, well no, now these are my pallets, well wait yesterday, what was them pallets, well ya know yesterday I think those were my pallets. Ya know what I mean?

[Tisdale]:      Yes ma'am.

[Bynum]:        And I think that's probably what's happening here . . . I just, ya know, I just feel like, that with everything that you've told us, that, ya know you're trying to be helpful, you're trying to be as honest as you possibly can and trying to recall as much as you can to, ya know, that if there has been mistakes made, we're gonna clear them up now. Ya know, I think that you need to get a hold of, ya know you're gonna have to slow down, you're not a young man.

[Tisdale]:      Uh huh.

J.A. at 104-07 (Bynum Interview Tr.). Finally, after several hours, when asked to estimate how many FedEx loads could have been mistakenly registered as his own, Tisdale stated "[m]aybe about three loads" but clarified that he was "just taking a wild guess at what, ya know, at what could have transpired." J.A. at 110 (Bynum Interview Tr.). Following the interview, Bynum wrote out a statement, which Tisdale signed, stating that McKinney had paid him for FedEx pallets "maybe 3 or 4 times." J.A. at 1137 (Employee Statement at 11). She also wrote an investigative memo to management which stated that Tisdale admitted to stealing three or four loads and omitted any indication that it might have been a mistake.[3] Bynum admitted at trial that during the interview she "just needed [Tisdale] to admit that he had taken the pallets and he had stole[n] them and failed to turn in the money." J.A. at 386 (Trial Tr. Vol. III at 723). She also testified that she did not discuss with Gardner the specifics of the FedEx pallet account, but just asked him for general background information.

On February 21, 2000, Stuthard terminated Tisdale's employment on the grounds of theft of company property. No investigation was ever undertaken with respect to the other FedEx drivers who had collected pallets for McKinney. Tisdale filed a grievance through FedEx's Guaranteed Fair Treatment Procedure, claiming that he was terminated because of race. Ultimately, FedEx management upheld the termination. Tisdale then filed a charge with the EEOC, which issued him a right-to-sue notification. On December 12, 2000, Tisdale filed suit against FedEx in the United States District Court for the Middle District of Tennessee alleging a violation of his rights under Title VII. Following a contentious discovery period and a three-day trial, the jury found FedEx guilty of retaliation in violation of Title VII, and awarded Tisdale $100,000 in punitive damages. The district court also awarded Tisdale backpay in the amount of $15,000, which was stipulated to by the parties. FedEx appeals from the verdict and the award of punitive damages on several grounds.

## II. ANALYSIS

### A. Discovery Sanctions

The first issue which FedEx raises in its appeal is that the district court erred in denying its motion to dismiss and/or strike evidence of backpay because of Tisdale's abuse of the discovery process. Upon review, we conclude that the district court did not abuse its discretion in denying FedEx's motion on the grounds that Tisdale failed to supplement his interrogatory responses.

---

[3] In her testimony at trial, the only documentary evidence Bynum cited that Tisdale received money for FedEx pallets was a picture of a load of FedEx pallets sold to McKinney on January 26, 2000, and a check written to Tisdale on January 27, 2000, for $781.25. In his testimony, Stuthard estimated that approximately 200-250 pallets were in the truck, which means McKinney paid roughly $3.47 per pallet. J.A. at 528-29 (Trial Tr. Vol. III at 562-63). McKinney typically paid between $0.25 and $3.75 per pallet depending upon the quality. On February 4, 2000, McKinney paid FedEx $326.25 for 261 pallets, or approximately $1.25 per pallet. J.A. at 1156-57 (McKinney Check and Invoice). There is no evidence in the record that a second collection of FedEx pallets was taken to McKinney after the January 26th load. Tisdale argued at trial that the February 4th check was for the January 26th delivery, which had not been unloaded until then.

Pursuant to Federal Rule of Civil Procedure 26(e)(2), "[a] party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect." Fed. R. Civ. P. 26(e)(2). Failure to do so results in the party being unable to use the undisclosed information at trial as well as "other appropriate sanctions" that the district court may impose. Fed. R. Civ. P. 37(c)(1). "We review a district court's decision regarding Rule 37 sanctions for abuse of discretion." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 343 (6th Cir. 2002). We have stated that "[a]n abuse of discretion occurs when (1) the district court's decision is based on an erroneous conclusion of law, (2) the district court's findings are clearly erroneous, or (3) the district court's decision is clearly unreasonable, arbitrary or fanciful." *Id.* (internal quotation omitted). Moreover, factors which should be considered in determining whether the district court abused its discretion include "prejudice resulting from the discovery abuse, whether the noncooperating party was warned that violations would result in sanctions, and whether the court considered less drastic sanctions." *Id.*

In this case, FedEx argues that Tisdale provided false responses and omitted information from his responses to its discovery requests regarding his post-termination employment. Reviewing FedEx's motion prior to trial, the district court agreed with FedEx in part and therefore dismissed Tisdale's claim for front pay. In its appeal to this court, FedEx contends that the district court should have dismissed the entire retaliation claim or the backpay claim in light of Tisdale's discovery abuse. Specifically, FedEx argues that Tisdale failed to provide information about his employment at a numbers house, work he did for a moving company, and his side business of repairing shoes. FedEx also claims that Tisdale omitted the names of several employers to whom he applied for jobs. Upon review of the record, we conclude that FedEx's argument is without merit.

First, the record reveals that Tisdale took significant steps to try to comply with FedEx's extensive discovery requests. *See* J.A. at 301-03. (Notice of correspondence from Tisdale to FedEx regarding discovery responses). In a letter dated July 9, 2002, Tisdale provided a list of all his current and potential employers, including those that FedEx cites in its brief as omitted. J.A. at 273 (Letter from David B. Lyons to Mary Jane Palmer (July 11, 2002)). Tisdale also provided his tax information from 2001 and 2002 as well as signed releases enabling FedEx to discover any records relating to his employment held by his employers. Tisdale's inability to comply fully with FedEx's request is largely a result of the fact that his post-termination economic livelihood consisted of sporadic employment with several different employers supplemented by many informal, discrete jobs, such as fixing co-workers' shoes or helping to load a moving truck. The absence of information provided to FedEx is a result of the non-existence of such information. Thus, we conclude that the record does not reveal that Tisdale intentionally withheld any information from FedEx.

Moreover, there is no evidence in the record that the absence of the requested information in any way prejudiced FedEx in this case. Recognizing the ambiguous and uncertain nature of Tisdale's post-termination employment, the district court dismissed Tisdale's front-pay claim. The district court's sanction was an appropriate remedy for the absence of information FedEx sought. The district court concluded, however, that FedEx had sufficient knowledge of Tisdale's employment activities such that it could thoroughly cross-examine him on the issue of backpay. Indeed, FedEx challenged Tisdale at trial about several of his post-termination jobs including those about which it claims full information was withheld. *See* J.A. at 618-24 (Trial Tr. Vol. I at 378-83, 386).

In sum, we conclude the district court's sanction of striking the front-pay claim was an appropriate response to Tisdale's failure to respond fully to FedEx's discovery requests. Accordingly, we hold that the district court did not abuse its discretion in denying FedEx's motion to dismiss the complaint in its entirety and/or strike evidence of backpay as a discovery sanction.

## B.  Renewed Motion for Judgment as a Matter of Law

The second issue which FedEx raises on appeal is that it is entitled to judgment as a matter of law because Tisdale's EEOC complaint failed to include a retaliation claim.[4] Upon review, we conclude that the district court did not err in denying FedEx's renewed motion for judgment as a matter of law.

We review a district court's denial of "a renewed motion for judgment as a matter of law *de novo*." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). Judgment as a matter of law is appropriate when "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (internal quotation omitted). In this case, FedEx argues that it is entitled to judgment as a matter of law because Tisdale failed to check the box on the EEOC form marked "retaliation." As a result, FedEx argues that Tisdale failed to exhaust his administrative remedies, and therefore his retaliation claim should have been dismissed. Though it is undisputed that the retaliation box was unchecked, we conclude that FedEx's argument is without merit.

We have stated that "if a plaintiff did not first present a claim to the Equal Employment Opportunit[y] Commission, that claim may not be brought before the federal courts on appeal." *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992). In the case of a retaliation claim not included in an EEOC charge, we have held that "retaliation claims based on conduct that occurred *before* the filing of the EEOC charge must be included in that charge." *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001); *accord Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 547 (6th Cir. 1991). We have cautioned, however, that an EEOC charge "filed by lay complainants" should be "liberally construed," *Haithcock*, 958 F.2d at 675, because they "are unschooled in the technicalities of the law and proceed without counsel." *Ang*, 932 F.2d at 546. Actions in federal court "should not be restricted by the failure of a complainant to attach the correct legal conclusion to the EEOC claim, conform to procedural technicalities, or include the exact wording which might be required in a judicial pleading." *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998) (internal quotation omitted). Thus, where the claimant is unrepresented, a "broader reading of the charge . . . is compelled." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999). In such cases, we have stated that "[t]he judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Ang*, 932 F.2d at 545 (internal quotation omitted). Therefore, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Davis*, 157 F.3d at 463.

In applying this principle, we have found jurisdiction over a Title VII retaliation claim even though the complainant failed to check the retaliation box on the EEOC form. In *Duggins*, the plaintiff "related facts to the EEOC which would have prompted an investigation into retaliation." 195 F.3d at 832. We stated that "[w]here the plaintiff alleged facts to the EEOC which clearly included retaliation allegations . . . and where that plaintiff was not represented by legal counsel in

---

[4]Tisdale argues in his brief that we should not consider FedEx's appeal from the ruling on the motion for judgment as a matter of law under Rule 50(a) made at the close of all the evidence. Indeed, we have held that where an appellant has made "a Rule 50(a) motion at the close of evidence that was . . . denied, lost in front of a jury, then renewed its arguments in a rejected Rule 50(b) motion after entry of judgment, we will review only the denial of the Rule 50(b) motion." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174 (6th Cir. 1996). Though FedEx refers to this argument in its brief as an appeal of the denial of its motion for judgment as a matter of law, it is unclear whether FedEx is referring to its Rule 50(a) or Rule 50(b) motion. The distinction is irrelevant, however, because FedEx made the same argument in both motions. *See* J.A. at 331 (Dist. Ct. Order). Accordingly, we assume that FedEx is appealing the ruling on the renewed motion for judgment as a matter of law, rather than the earlier Rule 50(a) decision.

writing her one-page EEOC charge, such a plaintiff should not be precluded from bringing a retaliation claim in the complaint." *Id.* at 833. We also noted that "retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim forseeable to [the] defendants." *Id.*

Applying these principles to Tisdale's case, we conclude that the district court did not err in denying FedEx's renewed motion for judgment as a matter of law. While it is true that Tisdale failed to check the retaliation box on his EEOC charge, at the time he completed the EEOC charge, he was not represented by an attorney and did not know what the word "retaliation" meant. J.A. at 615 (Trial Tr. Vol. I at 374), 630 (Trial Tr. Vol. I at 405). Moreover, Tisdale testified that he did not prepare the charge himself, but instead recounted his story to a clerk in the EEOC office, who prepared it for him. The charge also contains several factual errors, which Tisdale explained that he did not catch because of his dyslexia. J.A. at 629-30 (Trial Tr. Vol. I at 404-05). In light of these circumstances, we decline to penalize Tisdale for failing to reach the correct legal conclusion on the EEOC charge.

While it is unclear from the record what precisely Tisdale related to the EEOC, both his discrimination claim and his retaliation claim contain the same common core of operative facts — specifically, that he was terminated after complaining about the treatment of African-American employees in a public meeting. Tisdale has not alleged any other separate acts of racial discrimination which led to his termination. Thus, because we must draw all reasonable inferences in favor of Tisdale, we can infer that he told the EEOC that he had complained to management about the treatment of African-American employees at BNART. The charge states that Tisdale was terminated from FedEx for selling pallets, but that he believed that he was discriminated against because of his race. By stating that he was discharged and that he believed race played a role coupled with the inference that he told the EEOC that he had complained about the treatment of African-American employees at BNART, a seasoned EEOC investigator would be naturally prompted to investigate the uncharged retaliation claim despite the procedural shortcomings in the formal charge. Thus, we hold that the retaliation claim could reasonably be expected to grow out of the charge of discrimination, and therefore, the district court did not err in denying FedEx judgment as a matter of law.

## C. Motion for a New Trial

The next issue which FedEx raises on appeal is that it should be entitled to a new trial because the jury verdict was against the clear weight of the evidence. Upon review, we conclude the district court did not err in denying FedEx's motion for a new trial.

"We review the denial of a motion for a new trial under an abuse of discretion standard." *United States, ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 450 (6th Cir. 2005) (internal quotation omitted). Where the motion for a new trial is on the grounds that the jury verdict was against the clear weight of the evidence, we have explained that:

> A court may set aside a verdict and grant a new trial when it is of the opinion that the verdict is against the clear weight of the evidence; however, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable. Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper.

*Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820-21 (6th Cir. 2000) (internal quotations omitted).

In this case, FedEx argues that its motion for a new trial should have been granted because the clear weight of the evidence does not support a finding of retaliation. Specifically, FedEx argues

that Tisdale could not satisfy the second and fourth prongs of the prima facie case for retaliation: knowledge by the decision-maker and a causal connection between the protected activity and the adverse employment action. We have explained, however, that "[w]hen reviewing the facts of a discrimination claim after there has been a full trial on the merits, we must focus on the ultimate question of discrimination rather than on whether a plaintiff made out a prima facie case." *Barnes v. City of Cincinnati*, 401 F.3d at 736. "That is, the sole remaining issue [is] discrimination *vel non*." *Noble*, 391 F.3d at 721 (internal quotations omitted). Thus, "we cannot simply hold that the plaintiff's failure to provide evidence of an essential element of her prima facie case is dispositive here. Rather, we must look to the ultimate question — whether the plaintiff has proven that her discharge was intentionally discriminatory." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001). In making that determination, however, "whether the plaintiff has in fact presented evidence supporting each element of her prima facie case is material to the determination of whether she has demonstrated that the employer's articulated reason for the discharge is not credible." *Id.* at 600.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). "'[The plaintiff] may succeed in this [*i.e.*, in persuading the court that she has been the victim of intentional discrimination] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (alteration in original). "With respect to the indirect method of proof, which is what is involved in this case, the Supreme Court has said that '[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Noble*, 391 F.3d at 721 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). We have stated that a plaintiff can establish that an employer's reason is not credible by demonstrating "either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation omitted).

Applying these principles to this case, we conclude Tisdale has demonstrated sufficient evidence by which a reasonable jury could find that FedEx's reason for his termination was not credible under any of the three *Manzer* factors. First, a reasonable juror could find that FedEx's reason for firing Tisdale, theft of company property, had no basis in fact. FedEx does not cite any evidence in the record to prove that Tisdale actually kept any money generated from the sale of FedEx pallets. Gardner, the senior manager at BNART and the person who oversaw the FedEx pallet account, told Miller he did not believe that there was a discrepancy. Bynum, FedEx's chief investigator, never spoke to Gardner about the details of the FedEx pallet account or ever attempted to reconcile the account balance with the checks from McKinney to determine if any were missing. Instead, Bynum testified at trial that her goal was to get Tisdale to admit that he stole FedEx pallets. Relying on manipulative interrogation techniques, Bynum finally coerced Tisdale into admitting that a mistake may have occurred. Bynum reported to her supervisors however that Tisdale admitted that he intentionally stole company property three or four times, which became the basis for his termination.

Second, a reasonable juror could find that FedEx's proffered reason did not actually motivate Tisdale's discharge. Tisdale had run the pallet-recycling program since 1997 without any complaints from management and even received an employee recognition award for his efforts. Following Tisdale's public statements about how African-Americans were treated at BNART and his private meeting with Miller, the regional managing director, a formal investigation into the pallet program was begun at Miller's behest three days later, and Tisdale was suspended four days after that. Prior to Tisdale's creation of the pallet-recycling program, FedEx characterized the pallets as

waste and discarded them in a dumpster; yet according to FedEx, the pallets were company property sufficient to support termination of Tisdale for theft. No other employee, including one who kept the proceeds from the sale of FedEx pallets for himself, was ever investigated by FedEx.

Third, a reasonable juror could find that FedEx's proffered reason was insufficient to motivate Tisdale's discharge. Despite the ambiguity of its policy regarding pallets and the absence of any clear evidence of wrongdoing, FedEx chose to terminate Tisdale rather than impose a lesser sanction such as a suspension or probation. No other employee connected with the pallet-recycling program was ever investigated, not even the one who sold the pallets for his personal profit.

In addition to disbelieving FedEx's proffered reason for Tisdale's termination, a reasonable jury could also believe Tisdale's explanation of intentional discrimination. Tisdale had a long history of speaking out about discriminatory practices at FedEx. He repeatedly complained about the lack of career opportunities for African-American employees and even organized a boycott of the office Christmas party. The pallet investigation was started days after his public comments about discriminatory practices at BNART, and he was terminated shortly thereafter. It is also clear from the manner in which the investigation was conducted that FedEx management was targeting Tisdale.

In sum, we conclude that given all the evidence in this case, a reasonable juror could find that FedEx's purported reason for Tisdale's termination was not based in fact, did not actually motivate the discharge, and was insufficient to warrant termination anyway. Moreover, we conclude that a reasonable juror could believe Tisdale's explanation of intentional discrimination. Accordingly, we hold the district court did not err (nor did it abuse its discretion) in denying FedEx's motion for a new trial.

## D. Punitive Damages

FedEx challenges the award of punitive damages on several grounds. After reviewing the merits of each of FedEx's arguments, we conclude that the district court did not err in refusing to set aside the award of punitive damages.

### 1. Sufficiency of the Evidence

FedEx first argues that the district court erred by failing to grant its Rule 50(b) motion on the issue of punitive damages because the award was against the clear weight of the evidence. As we stated above, we review a district court's denial of "a renewed motion for judgment as a matter of law *de novo*." *Barnes*, 401 F.3d at 736. We have explained that:

> In a federal question case, the standard of review for a Rule 50 motion based on sufficiency of the evidence is identical to that used by the district court. The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant.

*Williams v. Nashville Network*, 132 F.3d 1123, 1130-31 (6th Cir. 1997). In its brief to this court, FedEx argues that even if its actions against Tisdale were retaliatory, no reasonable juror could find that those actions could be imputed to FedEx. We find this argument to be unpersuasive.

Punitive damages are available in a Title VII claim where the plaintiff can demonstrate by a preponderance of the evidence that the employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court has noted that the statutory language indicates Congressional intent "to narrow the class of cases for which punitive awards are available to a subset of those involving intentional discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). The Court reasoned that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536. Punitive damages liability does not arise where "the employer may simply be unaware of the relevant federal prohibition," believes the discrimination is lawful, or "reasonably believe[s]" that the "discrimination satisfies a bona fide occupational qualification defense." *Id.* at 536-37. Thus, an employer may be held vicariously liable for punitive damages "for the intentionally discriminatory conduct of its employee, where the employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good-faith efforts to comply with Title VII." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 442 (4th Cir.) (interpreting the *Kolstad* opinion), *cert. denied*, 531 U.S. 822 (2000).

First, FedEx argues that all of its employees involved in Tisdale's termination are middle management and therefore, liability cannot be imputed to FedEx. The mere fact that FedEx is a large, global corporation with a multi-layered management structure is insufficient by itself to shield it from liability under Title VII. In *Kolstad*, the Supreme Court stated that whether an employee serves in a "managerial capacity" is determined by "the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." 527 U.S. at 543 (internal quotation omitted). The "employee must be important," but not necessarily "top management, officers, or directors, to be acting in a managerial capacity." *Id.* (internal quotation omitted). We, along with several other courts of appeals, have held that non-senior management employees can serve in a managerial capacity. *See Jeffries v. Wal-Mart Stores, Inc.*, No. 99-4150, 2001 WL 845486, at *10 (6th Cir. July 20, 2001) (holding that Wal-Mart store managers, a district manager, and a regional manager served in a managerial capacity so as to impute punitive damages liability onto the corporation as a whole); *Lowrey*, 206 F.3d at 444 (holding that a department manager who supervised nine other employees, had the authority to hire new persons, and had discretion to organize the department, could constitute an employee in a managerial capacity); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1247 (10th Cir. 1999) (applying *Kolstad* to find that both an assistant store manager, who had the authority to suspend subordinates and make hiring and firing recommendations, and the store manager, whose responsibilities included the operation of the store and making hiring and firing decisions, held managerial positions for purposes of vicarious liability in the punitive damages context). In this case, the initial investigation was conducted by Stuthard, the operations manager at BNART, who had the authority to suspend and terminate employees. Moreover, Miller, whose authority is to supervise all of FedEx's operations in the district, instigated the security investigation against Tisdale. Miller gave tacit approval to the actions taken by Bynum and Stuthard, and concurred in the decision to terminate Tisdale. Given their significant authority and discretion, a reasonable juror could find that Stuthard and Miller served FedEx in a managerial capacity for purposes of vicarious liability in the punitive damages context.

FedEx's second argument is that even if the actors could be found to have served in a managerial capacity, the decisions cannot be imputed to FedEx because they are contrary to the company's good-faith efforts to comply with the law. The Supreme Court, in *Kolstad*, stated that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII." 527 U.S. at 545 (internal quotation omitted). We have suggested in dicta that the mere existence of a written anti-discrimination policy alone does not shield the company from

punitive damages. *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 514, 521 n.5 (6th Cir. 2001). Other courts of appeals have explicitly held that an anti-discrimination policy by itself does not shield an employer from liability. As the Fourth Circuit has stated, "[w]hile an employer's institution of a written policy against race discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind with respect to racial minorities, *such a policy is not automatically a bar to the imposition of punitive damages.*" *Lowery*, 206 F.3d at 446 (emphasis added). *See also Wal-Mart Stores, Inc.*, 187 F.3d at 1248 (holding that a written anti-discrimination policy alone is not enough). The Fourth Circuit has explained that an employer's written policy does not shield it from liability where there is sufficient evidence which "called into question" the sincerity of the employer's commitment to abide by it. *Lowery*, 206 F.3d at 446. Similarly, the Tenth Circuit held that a company policy did not shield an employer from liability where there was evidence that the employees were never trained about the policy or were even aware of it. *Wal-Mart Stores, Inc.*, 187 F.3d at 1248-49.

Applying these principles to this case, we are not persuaded that a reasonable juror could only conclude that FedEx engaged in good-faith efforts to comply with Title VII. Though FedEx has placed much evidence in the record in support of its anti-discrimination policies, Tisdale also presented evidence of a number of inconsistent practices at the BNART station, which calls into question FedEx's sincerity to abide by its own written policies. Tisdale testified at trial that he had been complaining about the disparate treatment of African-American employees from 1997 through 2000, and that FedEx made little effort to change. Despite FedEx's professed commitment to diversity, Tisdale explained that there were no African-American managers, supervisors, or office staff at the BNART station during the time he worked there. Several African-American employees testified that they believed that when office jobs became available, African-Americans were passed over in favor of white employees. To protest what they believed were management's discriminatory practices, the African-American employees at BNART boycotted the 1999 Christmas Party. Eighteen African-American employees signed a letter to Miller outlining the perceived racial discrimination at BNART. At trial, FedEx's operations managers conceded that there were racial tensions at BNART during those years. FedEx's own internal documents admit "[s]everal incidents of poor management practices" at the BNART station which "foster[ed] the mistrust of management and [led] to the deterioration of morale." J.A. at 1114 (Memorandum from Miller to Lana Luster 2 (Mar. 23, 2000)). Whether the allegations made by the African-American employees concerning discriminatory treatment were proven true is not the focus of our inquiry, but instead we must decide whether reasonable minds could not come to any conclusion other than the one favoring FedEx. In this case, we conclude that in light of all the evidence presented by Tisdale, a reasonable jury could find that FedEx did not engage in good-faith efforts to treat its minority employees fairly as required by the law.

Moreover, despite FedEx's written policy against retaliation, a reasonable jury could find that FedEx ignored its own policies and terminated Tisdale because he voiced concerns about management's discriminatory practices. Though FedEx has established the Guaranteed Fair Treatment Procedure ("GFTP") to ensure against retaliatory terminations, the evidence in the record reveals that the administrative review of Tisdale's termination amounted to little more than a rubber-stamp approval of Bynum's dubious investigation. Shannon Brown ("Brown"), a FedEx regional vice president, participated in the second step of the GFTP process with regard to Tisdale's termination and testified at trial that he did not conduct an independent investigation of his own but rather relied on the reports from Bynum and Miller. Specifically, Brown testified that he relied on Bynum's report which stated that Tisdale admitted to intentionally keeping money from the sale of FedEx pallets three or four times. Tisdale wrote a letter to Brown specifically stating that "at NO time did I fail to turn in FedEx monies, nor did I say I sold pallets and I was confused when selling the pallets." J.A. at 934 (Letter from Tisdale to Brown 2 (July 7, 2000)). Despite this fact, Brown never questioned the accuracy of Bynum's report nor did he even speak to Tisdale or Gardner prior

to deciding to uphold the termination. Thus, we conclude that in light of all the evidence presented, a reasonable juror could find that FedEx did not engage in good-faith efforts to comply with the law.

### 2.  Due Process

Finally, FedEx challenges the $100,000 punitive damages award as unconstitutional under the Due Process Clause of the Fifth Amendment. We find this argument to be unpersuasive as well.

We "apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001). FedEx's sole argument is that because Tisdale failed to recover any compensatory damages, the award of punitive damages is unconstitutionally excessive pursuant to the Supreme Court's holding in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). While we have held that punitive damages are available in a Title VII suit even if only nominal damages were awarded, *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 672 (6th Cir. 2003) (en banc), we have never addressed the issue of punitive damages awarded in the absence of compensatory damages. Every court of appeals which has addressed the issue has upheld the punitive damages awards. *See, e.g.*, *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 341-42 (4th Cir. 2002); *EEOC v. W&O, Inc.*, 213 F.3d 600, 615 (11th Cir. 2000); *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001); *Provencher v. CVS Pharmacy*, 145 F.3d 5, 12 (1st Cir. 1998); *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998). The common-law purpose of requiring compensatory damages as a precondition to allowing punitive awards is to ensure a limitation on the amount which a jury could award "where the wrongs are insubstantial." *Cush-Crawford*, 271 F.3d at 358. We agree with our sister circuits that this rationale does not hold in the Title VII context, and thus a precondition of compensatory damages is unwarranted.

First, we note that "[n]othing in the plain language of § 1981a conditions an award of punitive damages on an underlying award of compensatory damages." *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1352 (7th Cir. 1995). Moreover, as the Seventh Circuit reasoned, "the familiar tort mantra that [p]unitive damages may not be assessed in the absence of compensatory damages," does not apply in the Title VII context because "the most obvious economic damages in a wrongful discharge case" is backpay, which is statutorily excluded from compensatory damages under Title VII. *Id.* (internal quotation omitted); 42 U.S.C. § 1981a(b)(2). Backpay was statutorily excluded from compensatory damages "to prevent double recovery, as Title VII already provided for back pay; the exclusion was not the result of viewing a back pay award as fundamentally distinct from compensatory damages." *Provencher*, 145 F.3d at 11. Thus, conditioning punitive damages on an award of compensatory damages excludes plaintiffs who may have been grievously wronged. Because backpay awards under Title VII serve a similar purpose as compensatory damages awards under the common law, courts have held they may be considered in determining the appropriate size of a punitive damages award. *W&O, Inc.*, 213 F.3d at 615; *Hennessy*, 69 F.3d at 1352. Moreover, the statutory caps on punitive damages, 42 U.S.C. § 1981a(b)(3), ensure against limitless awards in cases of insubstantial harm. As a result, two courts of appeals have upheld punitive damages awards even in the absence of both compensatory damages and backpay. *Cush-Crawford*, 271 F.3d at 359; *Timm*, 137 F.3d at 1010.

In sum, we agree with the reasoning of our sister circuits and conclude that there is no reason to condition punitive damages on the award of actual or nominal compensatory damages. In this case, the punitive damages award is $100,000, less than seven times the backpay award and one-third of the maximum which Congress determined to be reasonable for a company of FedEx's size. Accordingly, we conclude that the district court did not err in refusing to set aside the punitive damages award.

**E.  Evidentiary Rulings**

FedEx's final argument on appeal is that during the trial the district court erred with regard to several evidentiary rulings.  Upon review, we conclude that the district court did not abuse its discretion with regard to most of the evidentiary rulings and the few errors which did occur did not substantially prejudice FedEx.

We have stated that "[d]ecisions regarding the admission and exclusion of evidence are within the peculiar province of the district court and are not to be disturbed on appeal absent an abuse of discretion." *Medshares*, 400 F.3d at 439-40 (internal quotation omitted).  We have explained that "the district court's decision regarding this evidence should remain undisturbed unless [we are] left with the definite and firm conviction that the district court clearly erred in its judgment after weighing the relevant factors, improperly applied the correct law, or inappropriately used the wrong legal standard." *Shanklin v. Norfolk So. Ry. Co.*, 369 F.3d 978, 988 (6th Cir. 2004).  Moreover, "[e]ven if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998).  Applying this standard, we conclude that none of the evidentiary rulings that FedEx cites requires a new trial.

First, FedEx argues that the district court permitted irrelevant testimony from Tisdale and several of his witnesses regarding claims of race discrimination made by other employees and FedEx's failure to respond to them.  The district court admitted the evidence as "relevant to Mr. Tisdale's advocacy on behalf of others." J.A. at 455 (Trial Tr. Vol. I at 99).  The district court explained that this case was about "Mr. Tisdale's complaints, Federal Express's knowledge of those complaints and whether his termination was in retaliation for complaints" but cautioned the parties that "we're not going to allow any proof as to whether the complaints are meritorious or not." J.A. at 456 (Trial Tr. Vol. I at 100).  We conclude that the district court's ruling was not an abuse of discretion.

Second, FedEx argues that several witnesses testified about events not within their personal knowledge in violation of Federal Rule of Evidence 602.  The pages cited in FedEx's brief, however, reveal only one instance when FedEx objected on the grounds of personal knowledge, which was prior to the witness even testifying. J.A. at 454 (Trial Tr. Vol. I at 98).  In response to the objection, the district court warned Tisdale's attorney that the witnesses must have personal knowledge about that to which they are testifying, and instructed FedEx either to contemporaneously object or to cross-examine the witnesses as to that point. J.A. at 454-55 (Trial Tr. Vol. I at 98-99).  Once again, we conclude the district court's ruling was not an abuse of discretion and should not be disturbed.

Third, FedEx argues that the district court permitted certain witnesses to read from their affidavits, rather than using their affidavits for refreshing their recollection.  Specifically, Hurt, a witness for Tisdale, read several answers from his affidavit into evidence, including: that he worked for Tisdale picking up pallets, that they met at Shoney's to disperse the money, and that McKinney wrote the check to Tisdale. J.A. at 416-17 (Trial Tr. Vol. I at 129-30).  The record reveals, however, that all of these facts were testified to by Hurt a few minutes earlier at trial without the aid of his affidavit.  *See* J.A. at 412-14 (Trial Tr. Vol. I at 125-27).  Thus, whatever error resulted was harmless.  When FedEx made the same objection with regards to another witness, Fred McClendon, the district court properly ruled that the witness could not read the affidavit but must answer substantive questions. J.A. at 432-33 (Trial Tr. Vol. I 151-52).  Furthermore, the district court did not err in allowing Stuthard to be questioned about checks he had not seen prior to trial.  The district court correctly noted that the checks were in evidence and "[i]f he hasn't seen them, he can say he hasn't seen them." J.A. at 498 (Trial Tr. Vol. II at 457).

Fourth, the district court did err in allowing Tisdale's counsel to read into the record deposition testimony from Wrather, the general manager for McKinney, regarding his religious beliefs. The district court allowed the testimony because "[i]t's the witness's statement as to why he thinks he's a credible witness." J.A. at 684 (Trial Tr. Vol. III at 310). Federal Rule of Evidence 610, however, expressly prohibits evidence of religious beliefs "for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." Fed. R. Evid. 610. While the district court's ruling was erroneous, the religious testimony went to the tangential issue of whether Wrather was offended by the accusation that his company, McKinney, was involved in drugs or money laundering. The ruling had minimal, if any, impact on the jury verdict. Accordingly, we conclude that the error does not warrant the granting of a new trial.

FedEx's final few arguments are no more meritorious. FedEx argues the district court made improper hearsay rulings which prevented it from presenting its case concerning the investigation into the FedEx pallet account. The record reveals, however, that the district court carefully permitted as much of FedEx's evidence as possible that was not for the truth of the matter asserted but excluded the hearsay testimony. *See* J.A. at 363, 368, 518, 521 (Trial Tr. Vol. III at 683, 688, Vol. II at 495, Vol. III at 527). We conclude that the district court's rulings were not an abuse of discretion. The district court also excluded the testimony of police officer Milton, who was called to impeach Tisdale's testimony that he worked in a deli within the numbers house, rather than as a clerk taking bets. The district court excluded the testimony under Federal Rules of Evidence 609, 403, and 404, finding that the issue had "marginal relevance to credibility." Supp. J.A. at 2 (Trial Tr. Vol. III at 629). We hold that the district court's ruling on this issue was not an abuse of discretion. Finally, we conclude the district court did not abuse its discretion by excluding evidence of Tisdale's post-termination employment history. FedEx argued that the testimony would show that Tisdale was disciplined for acceptable conduct issues, such as having a bad attitude, sleeping on the job, misappropriating company property, and failing to report to work. The district court correctly ruled that the evidence was more unfairly prejudicial than probative under Federal Rule of Evidence 403, and was offered to show a propensity for bad acts which is inadmissible under Federal Rule of Evidence 404(b).

In sum, we conclude that the district court did not abuse its discretion with regard to most of the evidentiary rulings in this case, and the few errors which did occur did not substantially prejudice FedEx so as to warrant a new trial.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the jury verdict in favor of Tisdale as well as the award of $100,000 in punitive damages.